UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MELVIN H. BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | 18 C 8500 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| UCHICAGO ARGONNE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Melvin Brown brought this suit against his former employer, UChicago Argonne LLC, alleging that he was terminated in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, the common law retaliatory discharge tort, and the Illinois Whistleblower Act ("IWA"), 740 ILCS 174/1 *et seq*. Doc. 14. Argonne moves for summary judgment. Doc. 67. The motion is granted as to Brown's FMLA claim, and the court exercises its discretion under 28 U.S.C. § 1367(c)(3) to relinquish jurisdiction over the state law claims.

### Background

The court recites the material facts as favorably to Brown as the record and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). At this juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

Brown began work as a firefighter at the Argonne Fire Department in April 1997. Doc. 116 at ¶ 5. In 2010, he was promoted to Lieutenant and assigned to the Department's First Battalion. *Id.* at ¶¶ 5, 7. In April 2016, George Hyland became the Department's Fire Chief. *Id.* at ¶ 6. Brown was fired on June 6, 2017. *Id.* at ¶ 5.

1

Central to Brown's state law claims—but not to his FMLA claim—is his submission that he was fired for refusing to help the Department cover up its failure to properly administer certain tests and record their results. *Id*. at ¶¶ 36-48; Doc. 131 at ¶¶ 3-8. Because the court declines to exercise supplemental jurisdiction over the state law claims, there is no need to set forth here facts concerning Brown's (alleged) response to the Department's (alleged) coverup of its (alleged) failures regarding those tests.

Pertinent here, Brown also contends that he was fired for taking FMLA leave. On February 12, 2017, Brown was admitted to the hospital and diagnosed with medication-induced rhabdomyolysis, a malady involving the breakdown of muscle fibers. Doc. 116 at ¶ 49. On February 15, he informed Lieutenant Michael Pemble of his condition. *Ibid*. The same day, Chief Hyland emailed Kim Mandekich, to whom he reported, that he "[j]ust spoke with [Brown], and he told me his doctors have told him he will probably not be going back for at least a month." *Id*. at ¶¶ 6, 50 (first alteration in original). Mandekich responded that "[m]edical will be reaching out to [Brown] to complete FMLA paperwork so he's officially on their radar." *Ibid*. (first alteration in original). Hyland did not tell anyone else about Brown's medical leave and had no further communications about it with Mandekich. *Ibid*.

Also on February 15, Nurse Disability Case Manager Steven Wolfe sent Brown a letter notifying him that he might qualify for FMLA leave and enclosing an "Employee Rights and Responsibilities Notice" and a document entitled "Certification of Health Care Provider." *Id*. at ¶ 51. Two days later, Wolfe emailed Brown several documents related to his leave. *Ibid*. Brown's physician submitted a leave certification form on February 23, *id*. at ¶ 52, and Wolfe told Brown later that day that he had been approved for twelve weeks of FMLA leave, *id*. at ¶ 53. The same day, Wolfe informed Battalion Chief David Bamonti of the approval of Brown's leave.

*Id*. at ¶ 53.  On March 15, 2017, Brown's physician informed Argonne that he could return to work on March 20, and Brown did so that day.  *Id*. at ¶ 54.

Argonne submits that it fired Brown not for taking FMLA leave, but instead because an "investigation revealed that he had abused his authority by failing to reimburse a subordinate Firefighter (Chris Weber) for the cost of meals (theft), engaged in intimidation, and provided factually inaccurate information during Argonne's investigation."  Doc. 68 at 3.  Brown regularly participated in the First Battalion's "dinner fund" or "meal fund."  Doc. 116 at ¶ 55.  Ordinarily, the battalion would discuss in the morning what its members wanted for dinner that evening and would decide which firefighter would obtain the meal, and then all participants would give money to that firefighter.  *Ibid*.

In August 2016, Weber joined the First Battalion and volunteered to do much of the meal shopping.  *Id*. at ¶ 57.  At some point, Weber reported to Chief Bamonti that Brown had failed to make several contributions to the meal fund.  *Id*. at ¶¶ 57-59.  (The parties dispute *when* Weber informed Chief Bamonti and *how* Chief Bamonti initially responded, but those disputes are not relevant.)  Once Chief Hyland learned of the issue, he emailed Mandekich on April 26, 2017, explaining that he had spoken with Weber, that Weber was concerned Brown was taking advantage of his supervisory position, and that Weber would email Brown to ask for repayment in full by their next shift together.  *Id*. at ¶ 61.  Weber then sent an email to Brown seeking repayment of $52, although Weber later admitted his notes reflected that Brown actually owed $59.  *Id*. at ¶ 62.  Brown did not respond to Weber's email.  *Ibid*.

Chief Hyland then gathered additional information from Weber about Brown's alleged meal debt and forwarded that information to Mandekich and Howe.  *Id*. at ¶¶ 63-65.  Complying with Hyland's instruction to investigate, *id*. at ¶ 63, Howe interviewed Weber, Brown,

3

firefighters Rachel Sierzega and Jared Nugent, and Chief Bamonti, *id*. at ¶ 66. Sierzega, Chief Bamonti, and Nugent told Howe that they had heard or understood that Brown owed money, though they did not make clear the basis for their understanding or communicate it with certainty. *Id*. at ¶ 67.\* Weber told Howe that Brown actually owed him $140. *Id*. at ¶ 66.

Based on his investigation, Howe believed Weber and concluded that Brown had abused his position by not paying Weber, his subordinate, for meal costs. *Id*. at ¶ 68. Howe accordingly recommended to Mandekich that Brown be fired. *Ibid*. Accepting the recommendation, Mandekich placed Brown on unpaid administrative leave on June 2, 2017, *id*. at ¶ 69, and terminated him on June 6, *id*. at ¶ 71.

---

\* The nearly four pages Brown devotes in his Local Rule 56.1(b)(3) response to ¶ 67 of Argonne's Local Rule 56.1(a)(3) statement consist primarily of additional facts about Howe's interviews that go well beyond what was reasonably necessary to respond to Argonne's assertion. That is improper. A nonmovant seeking to assert facts that go beyond what is fairly responsive to the movant's factual assertion must do so not in a Local Rule 56.1(b)(3)(B) response, but in a Local Rule 56.1(b)(3)(C) statement of additional facts. *See Schwab v. N. Ill. Med. Ctr.*, 42 F. Supp. 3d 870, 874 (N.D. Ill. 2014); *Johnson v. Cnty. of Cook*, 2012 WL 2905485, at \*12 (N.D. Ill. July 16, 2012) ("It is inappropriate for a non-movant to include additional facts, meaning facts extraneous to the substance of the paragraph to which the non-movant is responding, in a Local Rule 56.1(b)(3)(B) response. Rather, Local Rule 56.1 *requires specifically* that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate statement under Local Rule 56.1(b)(3)(C) of any additional facts that require the denial of summary judgment.") (citations and internal quotation marks omitted). This requirement is not an exercise in formalism; rather, "[t]he rationale behind this rule is that if the non-movant includes additional facts in only the Local Rule 56.1(b)(3)(B) response, the movant is unfairly deprived of a vehicle under Local Rule 56.1 to dispute those facts because the rule permits movants to reply only to a Local Rule 56.1(b)(3)(C) statement, not a Local Rule 56.1(b)(3)(B) response." *Hall v. Vill. of Flossmoor Police Dep't*, 2012 WL 6021659, at \*8 n.8 (N.D. Ill. Dec. 4, 2012). The court therefore will disregard the extraneous facts in ¶ 67 and other portions of Brown's Local Rule 56.1(b)(3) response. *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008) (affirming the district court's refusal to consider additional facts set forth in the nonmovant's Local Rule 56.1(b)(3)(B) response); *see also Eason v. Nolan*, 416 F. App'x 569, 569-70 (7th Cir. 2011) (same); *Levin v. Grecian*, 974 F. Supp. 2d 1114, 1118 (N.D. Ill. 2013) (similar).

**Discussion**

**I.     FMLA Retaliation Claim**

Brown alleges that he was fired in retaliation for taking FMLA leave.  Doc. 14 at ¶¶ 113-118; Doc. 117 at 14-15.  The FMLA's retaliation provision "makes it unlawful for an employer to retaliate against an employee who exercises his FMLA rights."  *Carter v. Chi. State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015) (citing 29 U.S.C. § 2615(a)(2), (b)).  The court assesses "a claim of FMLA retaliation in the same manner that [it] would evaluate a claim of retaliation under other employment statutes, such as the ADA or Title VII."  *Burnett v. LFW Inc.*, 472 F.3d 471, 481 n.5 (7th Cir. 2006).  To forestall summary judgment, Brown must show that a reasonable jury could find that "(1) he engaged in a protected activity; (2) his employer took an adverse employment action against him; and (3) there is a causal connection between the protected activity and the adverse employment action."  *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012).

Argonne argues that Brown cannot satisfy the third element, causation.  As evidence of causation, Brown offers only temporal proximity and the purported weakness of Argonne's justification for firing him.  Neither suffices.

As to temporal proximity, Brown began his FMLA leave on February 12, 2017, Doc. 116 at ¶ 49, was approved for leave on February 23, 2017, *id*. at ¶ 53, returned to work on March 20, 2017, *id*. at ¶ 54, and was fired on June 6, 2017, *id*. at ¶ 5.  Accordingly, anywhere from two-and-one-half to four months passed between Brown's protected activity and his termination.  That timing, standing alone, does not create a triable issue as to causation.  *See Silk v. Bd. of Trs., Moraine Valley Comm. Coll., Dist. No. 524*, 795 F.3d 698, 710 (7th Cir. 2015) (holding that an interval of "a few weeks" was insufficient, standing alone, "to create a triable issue" on causation) (internal quotation marks omitted); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 390 (7th Cir. 2012) ("[A] seven-week interval, standing alone, is insufficient to create a

material issue regarding causation."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012) (same, as to intervals of "approximately five weeks" and "more than two months").

When considering the timing along with Brown's challenge to Argonne's justification for firing him, a reasonable jury still could not find that the justification (that Brown abused his authority in failing to reimburse Weber for meals obtained in conjunction with the dinner fund) was pretextual. "[P]retext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690, 698 (7th Cir. 2017) (alteration and internal quotation marks omitted); *see also Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015) ("The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge.") (internal quotation marks omitted). Brown offers five grounds on which he contends a jury could find that Argonne's justification for firing him was pretextual: (1) Weber did not complain about problems with the 2016 dinner fund contributions until April 2017; (2) Weber had made a separate complaint about Brown without bringing up the dinner fund problems; (3) Weber's initial email seeking payment from Brown sought an amount different from the amount Weber identified in later conversations and correspondence; (4) Brown did not have a meaningful opportunity to respond to the allegations against him; and (5) Howe's investigation was "flimsy," relied on improper evidence, and was coordinated with Hyland and Mandekich. Doc. 117 at 4-5.

Brown's position that Argonne inadequately investigated Weber's dinner fund complaint is, even if supported by the record, insufficient to establish pretext given the absence of evidence suggesting that Argonne did not sincerely believe that Brown had abused his authority in failing to reimburse Weber. *See King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017) (noting that

6

a court assessing a retaliation claim should focus not on "whether [a defendant's] decision to fire [a plaintiff] was correct, but [on] whether it was retaliatory"); *Lauth v. Covance, Inc.*, 863 F.3d 708, 717 (7th Cir. 2017) ("[J]udgments regarding the fairness of a particular action or the accuracy of an employer's belief about an employee's job performance have no place in determining whether the employer acted based on an improper motive."); *Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 899 (7th Cir. 1999) (noting that even where a "company may well have been mistaken in its beliefs about its employee and perhaps should have conducted a more thorough investigation, there [may nonetheless be] insufficient evidence from which to conclude that the employer did not honestly believe that the employee had committed" misconduct). That is especially so because Brown makes no effort to explain why the alleged deficiencies in Argonne's investigation were so severe as to suggest pretext on Argonne's part rather than, at worst, ineptitude. Nor does Brown buttress his argument with any evidence suggesting that anybody at Argonne was hostile to or even hesitant about his taking leave. *See Mourning v. Ternes Packaging, Ind., Inc.*, 868 F.3d 568, 572 (7th Cir. 2017) (affirming summary judgment on an FMLA retaliation claim where the plaintiff failed to "identify anyone in the office who she believed had an issue with her taking leave").

In any event, Brown's criticisms of Argonne's investigation do not suggest that anything was amiss. There is nothing inherently suspicious about Weber waiting a few months before reporting the dinner fund problem up the chain of command. And even if Weber's delay was suspicious, Brown offers no reason to impute that suspicion onto Howe, Chief Hyland, or Mandekich. The same goes for Weber having complained on a separate occasion about other actions by Brown and the variations in his note-keeping as to the amount Brown owed—Brown

7

does not say why either fact should color the court's view of the decisionmaking process that led to his termination, and the court can discern no reason why they should.

As for whether Brown was given an adequate opportunity to respond to Weber's complaint, employers need not follow rigorous standards of due process before terminating an employee for misbehavior. In fact, Brown had an opportunity to respond to Weber's email about the unpaid debt and chose not to do so. Doc. 116 at ¶ 62 (Brown did not reply to Weber's April 26, 2017 email requesting repayment). And the only sense in which Brown clearly contends that Argonne's investigation was "flimsy" is that it failed to follow evidentiary standards like the hearsay rule. Doc. 117 at 5. But an employer's failure to conduct an investigation in accordance with the Federal Rules of Evidence is not evidence of pretext. At most, Brown's critiques suggest that there was room for improvement in Argonne's investigatory methods. It is not this court's role, however, to devise and enforce best practices for Argonne's disciplinary procedures. *See Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 933 (7th Cir. 2020) ("We have said time and again (in more than one hundred reported opinions, by our count) that we are not a super-personnel department that will substitute our criteria for an employer's for hiring, promoting, or disciplining employees.").

The court accordingly concludes that Brown's evidence—weak temporal proximity and various critiques of Argonne's investigatory process—is insufficient to allow a jury to conclude that Argonne's stated reason for terminating him was pretextual. Brown therefore cannot satisfy the causation element of his FMLA claim. *See Burton*, 851 F.3d at 698 ("Burton has not presented sufficient evidence of pretext, and as a result she cannot establish but-for causation.").

Although not necessary to the court's holding, it bears mention that Brown, at the hearing on Argonne's motion, expressed less than full confidence in his FMLA claim. Specifically,

Brown (through counsel) acknowledged that, based on the evidence adduced in discovery, his state law claims are "clearly … stronger" than his FMLA claim. Doc. 137.

### III.     State Law Claims

Although neither the complaint nor the parties' Local Rule 56.1 submissions identify the members of Argonne (a limited liability company) and therefore its citizenship, all indications are that Argonne is an Illinois citizen and therefore that the parties are not diverse. Doc. 14 at ¶¶ 4-5 (invoking federal question jurisdiction for Brown's federal claim and supplemental jurisdiction for his state law claims). Jurisdiction over Brown's state law claims is thus premised on the supplemental jurisdiction statute, 28 U.S.C. § 1367(a). Section 1367(c)(3) provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if … the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "As a general matter, when all federal claims have been dismissed prior to trial, the federal court should relinquish jurisdiction over the remaining [supplemental] state claims." *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007); *see also Dietchweiler ex rel. Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016). That general rule has three exceptions: "when the [refiling] of the state claims is barred by the statute of limitations; where substantial judicial resources have already been expended on the state claims; and when it is clearly apparent how the state claim[s] [are] to be decided." *Williams*, 509 F.3d at 404; *see also RWJ Mgmt. Co. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 480 (7th Cir. 2012).

None of the exceptions apply here. First, if this court relinquishes supplemental jurisdiction over the state law claims, Illinois law would give Brown one year to refile the claims in state court if any claim's limitations period expired while the case was pending here. *See Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 515 (7th Cir. 2009) (citing 735 ILCS 5/13-217); *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (same). Second, substantial

9

federal judicial resources have not yet been committed to the state law claims. Third, it is not "absolutely clear how the [supplemental] claims can be decided." *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994). Because no exception applies, relinquishing jurisdiction over the state law claim is the appropriate course under § 1367(c)(3). *See Dietchweiler*, 827 F.3d at 631; *RWJ Mgmt. Co.*, 672 F.3d at 479-82.

## Conclusion

For the foregoing reasons, Argonne's summary judgment motion is granted as to Brown's FMLA claim. The court exercises its discretion under 28 U.S.C. § 1367(c)(3) to relinquish its supplemental jurisdiction over Brown's state law claims.

July 9, 2020                                             _____

                                                                           United States District Judge